IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


EVE L. HARRIS,
     Plaintiff,

v.                                    Case No. 3:04cv261/MCR/EMT

STATE OF FLORIDA DEPARTMENT
OF FINANCIAL SERVICES,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

     Pending before the court is Defendant's Motion for Summary Judgment and documents in support thereof (Docs. 19-27). Plaintiff, proceeding pro se, filed a memorandum and evidentiary materials in opposition (Docs. 28, 41, 42, 46).  Upon consideration of the materials submitted by the parties and for the reasons stated below, it is the opinion of the undersigned that Defendant's Motion for Summary Judgment should be granted.

I.     BACKGROUND

     Plaintiff raises claims of employer discrimination (disparate treatment and hostile work environment) and retaliation based on her race.  At the time of the events giving rise to this cause of action, Plaintiff was employed with Defendant State of Florida Department of Financial Services ("the Department") as an administrative secretary in the Division of Consumer Services, Bureau of Consumer Outreach and Education, in the regional office in Pensacola, Florida.  Although she is still employed with the Department as an administrative assistant, she now works in the Jacksonville Office of the Bureau of Fire and Arson Investigations (Doc. 25, Statement of Uncontested Facts ¶ 1).  The staff at the Pensacola office during the time that most of the events underlying this action occurred included the following persons:

       Cathy Prouty, Word Processing Systems Operator, Pensacola office, part-time
       Plaintiff, Administrative Secretary, Pensacola office, full-time
       Diana Kidder, Insurance Specialist III, full-time
       Robert McAuliffe, Insurance Specialist III, full-time
       Diana Chapman, Insurance Administrator and supervisor, full-time

(Doc. 46, Plaintiff's Aff. at 3).  The chain of command extended to Tallahassee and included the following persons:

       Lauren Cain, Bureau Chief, supervisor of Diana Chapman
       Asela McCall, former Bureau Chief
       Marta Arrington, Division Director for Division of Consumer Services, supervisor
        of Lauren Cain and Asela McCall
       Herb Yohner, Bureau Chief, Bureau of Personnel Management

(*id*. at 3, 6; Doc. 23, Affidavit of Marta Arrington ¶ 2).

In her affidavit, Plaintiff asserts the following facts which the court accepts for purposes of this motion.  On June 27, 2001, Plaintiff told Robert McAuliffe and Cathy Prouty that she had observed Diana Chapman and Diana Kidder leave the office for "spur-of-the-moment" meetings (Doc. 46, Plaintiff's Aff., Attach. B).  Plaintiff expressed her belief that such meetings were for personal gain and not official office business (*id*.).  Plaintiff told Ms. Prouty that she would no longer perform some of the duties of an Insurance Specialist (Diana Kidder's position) just so that Ms. Kidder could "roam the city during work hours" (*id*.).  Plaintiff states that the next morning, on June 28, 2001, Ms. Kidder's attitude toward her had changed, and it appeared to Plaintiff that Ms. Kidder did not want her involved in anything that concerned her (Ms. Kidder) within the office (*id*.).

On July 9, 2001, Plaintiff wrote a memorandum to Supervisor Chapman advising her that upon her (Plaintiff's) return from Naval Reserve training, she would no longer perform duties listed in Kidder's job description unless Ms. Kidder was absent or behind in her work (Doc. 46, Plaintiff's Aff., Attach. A).  Plaintiff also advised Chapman that she was concerned about staff attendance in the office (*id*.).  Plaintiff reported that staff members were absent for up to two hours during the day with no explanation, and they were also leaving early (*id*.).

Plaintiff wrote another memorandum to Supervisor Chapman on October 29, 2001, in which she requested that Chapman review a letter from Plaintiff to Asela McCall, Chapman's supervisor,

that Plaintiff never sent (Doc. 46, Plaintiff's Aff., Attach. B).  In the letter to Ms. McCall, Plaintiff stated that upon her return from Naval Reserve training on July 30, 2001, she and Supervisor Chapman discussed Plaintiff's memo, and Chapman stated she did not know the reason for Ms. Kidder's changed attitude toward Plaintiff (*id.*).  In August of 2001, as part of Plaintiff's job duties, Plaintiff proofread letters prepared by Ms. Kidder (Doc. 46, Plaintiff's Aff. at 2).  Plaintiff returned the letters to Ms. Kidder with punctuation corrections and, after a verbal exchange, Kidder commented to Plaintiff that she (Plaintiff) did not have a degree in grammar (*id.*).  Plaintiff discussed the incident with Supervisor Chapman, and two days later, Chapman discussed it with Ms. Kidder (*id.*; Doc. 27, Affidavit of Lauren Cain, Attach. 5).  The next day, Ms. Kidder apologized to Plaintiff, and her "ill treatment" of Plaintiff stopped (*id.*).  In the letter to Ms. McCall, Plaintiff also complained that Supervisor Chapman was unable to handle conflict among the employees she supervised (Doc. 46, Plaintiff's Aff., Attach. B).  Additionally, Plaintiff stated her belief that Ms. Kidder mistreated her because she refused to enable the "abuse of State funds" by performing Ms. Kidder's duties while she was out of the office (*id.*).

On approximately November 30, 2001, Plaintiff complained in a memorandum to Supervisor Chapman that she had little to do and that her job description indicated she should be doing more than the duties she was presently performing (handling telephone calls, photocopying, proofreading, and preparing mailings) (Doc. 46, Plaintiff's Aff., Attach. C).  In the memorandum to Supervisor Chapman, Plaintiff stated she was sending a copy of the memorandum to Ms. McCall "because you seem to not know everything that happens in this office when addressed with the situation (as before)." (*id.*).  That same day, Plaintiff sent an e-mail to Ms. McCall stating that she and Supervisor Chapman met regarding Plaintiff's job duties (Doc. 46, Plaintiff's Aff., Attach. D).  Supervisor Chapman told Plaintiff that other than the duties she was currently performing, there was nothing else for Plaintiff to do, unless Plaintiff took some of the duties of Insurance Specialist (Diana Kidders's position) (*id.*).  Plaintiff requested that her job description be updated to reflect the tasks that she was actually performing (*id.*).  Additionally, Plaintiff stated she would not accept duties of Insurance Specialist (*id.*).  Within two business days, Ms. McCall responded to Plaintiff's e-mail and requested that Plaintiff advise her of what duties Plaintiff felt she was not doing and what other responsibilities she was willing to accept (*id.*).  Instead of replying to the e-mail, Plaintiff requested

a meeting (Doc. 46, Plaintiff's Aff. at 3).  On December 12, 2001, a meeting was held between Ms. McCall, Supervisor Chapman, Plaintiff, and Marta Arrington, Ms. McCall's supervisor (*id*.). Plaintiff alleges Ms. McCall and Ms. Arrington minimized her complaint about Chapman's leaving the office during the work day to take of personal business, her complaint about Diana Kidder's "attitude," and her complaint that she did not have enough work to do (*id*.).  As a result of the meeting, Plaintiff's job description was revised to exclude some duties and include additional tasks taken from the position of Word Processing Systems Operator (*id*.).  The change of duties is reflected in the job descriptions dated September 20, 2001, and January 7, 2002 (Doc. 46, Plaintiff's Aff., Attachs. P-2, P-3, Q).

The following duties were eliminated from Plaintiff's job description:

1.     independently drafting responses to routine correspondence to assist the Administrator and insurance specialists,

2.     maintaining a file diary system for the Administrator and lead insurance specialist,

3.     coordinating assignments of other staff,

4.     maintaining the Administrator's calendar, scheduling the Administrator's appointments and conferences, and preparing the Administrator's time and leave reports, and

5.     making all travel arrangements for the Administrator and staff.

(*id*., Attachs. P-3, Q).

The following duties, which also appear in the Word Processing Systems Operator job description, were added to Plaintiff's job description:

1.     opening and distributing all incoming mail (not just the Administrator's mail), and

2.     receiving and sending faxes.

(*id*., Attachs. P-2, P-3, Q).  The duty of preparing information for weekly and monthly "TMIC" reports and other spreadsheet reports based upon office data was changed to specifically include preparing monthly reports, copying necessary documentation and reports, running and handling "network" reports, including letters, closing logs, referral and file folder postcard labels for staff,

and maintaining a spreadsheet showing the distribution of files in the office (*id.*, Attachs. P-3, Q). These specific duties were also listed in the Word Processing Systems Operator job description (*id.*, Attach. P-2).  Additionally, Plaintiff was given tasks regarding the preparation and maintenance of personnel files, which was not a task included in the Word Processing Systems Operator job description (*id.*, Attach. P-3).

On January 2, 2002, Ms. McCall sent an e-mail to Plaintiff inquiring how things were around the office (Doc. 46, Plaintiff's Aff., Attach. F).  One week later, Supervisor Chapman held an office meeting to discuss the changes in Plaintiff's duties (Doc. 46, Plaintiff's Aff. at 3).  The meeting ended when Diana Kidder and Cathy Prouty "yelled at" Plaintiff (*id.*).  Mr. McAuliffe calmed them down, and Supervisor Chapman "just sat there" (*id.*).  Plaintiff states Cathy Prouty began to "show hostility" toward her after that meeting (*id.*).

On January 30, March 7, April 10, May 10, and May 13, 2002, insignificant incidents of inharmonious interactions between Plaintiff and Ms. Prouty and Ms. Kidder occurred (Doc. 46, Plaintiff's Aff. at 3-5).[1]  Plaintiff reported the incidents to Supervisor Chapman, but Chapman did not take action on the complaints (*id.*).

In May of 2002, Lauren Cain replaced Ms. McCall as the Chief of the Bureau of Consumer Outreach and Education (Doc. 26, Cain Aff. ¶¶ 2, 7).  Upon her arrival at the Department, Ms. Cain was notified that the Pensacola office was "in turmoil"; therefore, she arranged a visit to the Pensacola office to meet the employees and encourage them to attempt a "fresh start" (*id.* ¶ 4).  On June 12, 2002, the day of Ms. Cain's visit, Plaintiff called the Pensacola office and left a message that she would be absent that day because her mother needed assistance (*id.* ¶ 5; Doc. 46, Plaintiff's Aff. at 5).  Ms. Cain believed it was important to speak with Plaintiff, therefore, she left messages

---

[1]On January 30, 2002, Cathy Prouty told a computer technician to send her, instead of Plaintiff, information regarding a cleaning tape and that she would share the information with Plaintiff, instead of requiring the technician to wait until Plaintiff returned from lunch.  On March 7, 2002, Ms. Kidder withdrew her request that Plaintiff prepare a travel reimbursement for her upon Plaintiff's informing Kidder that she could prepare the reimbursements for only two of the five days requested.  On April 10, 2002, Ms. Chapman reprimanded Plaintiff for failing to timely prepare one of Ms. Kidder's travel requests and failing to have a key to the postage meter available in Plaintiff's absence (Plaintiff admittedly accidentally took the key home on a Friday and was out of the office the following Monday).  On May 10, 2002, Ms. Kidder refused to permit Plaintiff to take a lunch break at 4:00 p.m. because Kidder planned to leave the office at 3:00 p.m.  On May 13, 2002, Ms. Prouty prepared a travel authorization for Ms. Kidder, which was a task on Plaintiff's job description.

at Plaintiff's home and her cellular telephone requesting that she return her call and meet with her (Doc. 26, Cain Aff. ¶ 5; Doc. 46, Plaintiff's Aff. at 5).  The next morning, Ms. Cain called the Pensacola office and spoke with Plaintiff prior to speaking with Supervisor Chapman (Doc. 26, Cain Aff. ¶ 5; Doc. 46, Plaintiff's Aff. at 5).  Ms. Cain inquired of Plaintiff why she did not return her calls, and Plaintiff responded that she was on leave to take care of her family (Doc. 26, Cain Aff. ¶ 5; Doc. 46, Plaintiff's Aff. at 5).  In a follow-up e-mail to Ms. Cain, Plaintiff advised her that her cellular telephone was not to be used by the Department except in an emergency (Doc. 26, Cain Aff. ¶ 5, Attach 1).

On July 23, 2002, Cathy Prouty sent an e-mail to Herb Yohner, Chief of the Bureau of Personnel Management, informing him of her desire to withdraw a grievance she had submitted, based upon Yohner's assurance during a conversation that day that the issues raised in the grievance would be addressed in "a couple of weeks" (Doc. 46, Plaintiff's Aff., Attach N–2).

On July 26, August 16, September 18, and October 22, 2002, another series of insignificant incidents of inharmonious interactions between Plaintiff and Ms. Prouty and Ms. Kidder occurred (Doc. 46, Plaintiff's Aff. at 6-8).[2]  On November 8, 2002, a staff meeting was held, at which Cathy Prouty began yelling that Plaintiff was a liar and a thief (*id*. at 8).  Ms. Prouty threatened to "knock you [Plaintiff] upside the head" (*id*.).[3]  On November 12, 2002, Plaintiff advised Supervisor

---

[2]On July 26, 2002, Ms. Kidder asked Plaintiff to add toner to the copy machine even though Ms. Prouty had already asked Plaintiff to do it, and Plaintiff had responded by telling Prouty where the toner was stored, thereby suggesting that she (Prouty) add the toner (Doc. 46, Plaintiff's Aff at 6).  On August 16, 2002, Plaintiff compared the job descriptions of her position (Administrative Secretary) and Cathy Prouty's position (Word Processing Systems Operator) and discovered that when her job description was revised (after she complained about not having enough to do), she was given tasks that appeared on the Word Processing Systems Operator description (*id*. at 7).  Plaintiff assumed that when she had agreed to take some of Ms. Prouty's duties, Prouty would be given additional duties, but Prouty's job description did not reflect additional duties (*id*.).  On September 13, 2002, Ms. Kidder placed brochures on Ms. Prouty's desk (*id*.).  On September 18, 2002, Kidder removed the brochures from Prouty's desk and took them into Supervisor Chapman's office (*id*.).  Chapman then placed the brochures on Plaintiff's desk and directed her to photocopy them (*id*.).  On October 22, 2002, Ms. Kidder denied Plaintiff's request to attend a benefits fair, and "hindered" Plaintiff's attendance on October 23, 2002 (*id*. at 7-8).

[3]In a sworn statement during the investigation of Plaintiff's EEOC charge, Cathy Prouty described the incident as follows:

"[S]he [Harris] hauled off and flipped me off.  I got up, I was mad, okay, I have an Irish Indian temper and I told her if she ever flipped me off again I'd knock her up side of her head."

(Doc. 20, Affidavit of Mary Kowalski, Attach. at 14).

Chapman and Mr. Yohner of the threat (*id*.; Doc. 41, Attach. 1).  Plaintiff and Chapman met on November 18, 2002, and Chapman offered to physically separate the work spaces of Plaintiff and Prouty by offering Plaintiff a private office (Doc. 46, Plaintiff's Aff., Attach. V-1).  Plaintiff accepted the offer and was subsequently relocated to a private office (*id.*, Attachs. V-1, V-2).  On November 26, 2002, Mr. Yohner sent Plaintiff a letter stating he was working with management about the situation and to ensure that she worked in a safe, non-threatening environment (Doc. 41, Attach. 2).

On December 9, 2002, following an inharmonious interaction between Plaintiff and Cathy Prouty regarding the playing of Christmas music, Plaintiff sent a letter to the chain of command in Tallahassee, including Lauren Cain, Marta Arrington, and Herb Yohner, as well as Karen Chandler, Deputy Insurance Commissioner, Paul Mitchell, Chief of Staff for the Commissioner, and Tom Gallagher, Commissioner of the Department, with a twenty-three (23) page attachment detailing the problems in the office from June of 2001 to December of 2002 (Doc. 46, Plaintiff's Aff. at 8; Doc. 27, Cain Aff., Attach. 5).  On January 24, 2003, Plaintiff sent a follow-up letter threatening to seek legal counsel due to the failure of anyone to respond to her letter of December 9 (Doc. 46, Plaintiff's Aff. at 9; Doc. 27, Cain Aff., Attach. 7).  On January 28, 2003, Lauren Cain responded to Plaintiff with a letter informing Plaintiff that her grievances were taken as seriously as everyone else's, stating her desire to resolve issues involving the Pensacola staff, addressing each of the issues raised in Plaintiff's December 9 letter, informing Plaintiff that it was appropriate that Plaintiff and Cathy Prouty receive counseling regarding their personnel matters, and informing Plaintiff that

---

When Plaintiff was asked by the investigator why Prouty threatened her, Plaintiff did not explicitly deny that she made the offensive gesture to Ms. Prouty:

"She (Prouty) said she saw me flip her off.  But I don't, I don't, that's not me.  I, I'm not gonna flip you off.  If I want to flip you off, I'll just tell you what they all said that means. . . . Maybe she did think I flipped her off.  I don't know."

(*id*. at 5).

Diana Chapman told the investigator that as a result of the incident, Ms. Prouty received either a written reprimand or a documented counseling session, and the work spaces of Plaintiff and Ms. Prouty were physically separated (*id* at 9).  Supervisor Chapman told the investigator that Plaintiff initially received a private office, but upon expansion of the staff, Plaintiff was returned to the reception area with Prouty and a partition was placed between them (*id*.).

communication training would be scheduled for all staff members of the Pensacola office (Doc. 27, Cain Aff., Attach. 6).

On February 12, 2003, Plaintiff was informed that her desk would be returned to her former work space shared with Cathy Prouty in order to provide an office for a new and more senior member of the office (Doc. 46, Plaintiff's Aff. at 9).  Two employees, Karen Mason and Rita Poff, both Caucasian, joined the Pensacola staff (*id*.).

To address the turmoil in the Pensacola office, Lauren Cain determined that Supervisor Chapman needed to improve her management skills; therefore, Ms. Cain placed Ms. Chapman on a three-month probation plan on November 26, 2003 (Doc. 27, Cain Aff. ¶ 6, Attach. 2).  Ms. Cain directed Ms. Chapman to perform the following "Next Steps":

-    Provide transition plan for staff relocating to new office, including protocol for administrative secretary to serve as receptionist for other offices in the building.

-    Draft new position descriptions for administrative secretary and word processing systems operator positions to reflect post-merger role/responsibilities.

-    Outline plan to welcome new specialist III into staff.

-    Maintain "No Internal E-mail" rule.

(*id*.).

On December 8, 2003, the Pensacola office was relocated to another building that housed three other divisions of the Department (Doc. 46, Plaintiff's Aff. at 10).  Plaintiff complained to Supervisor Chapman that she was displeased with the location of her desk in the reception area because she was tired of being treated as though she had no seniority over Cathy Prouty, a part-time employee who worked 10:00 a.m. to 2:00 p.m. (*id.*)  Additionally, Plaintiff stated that the fact that she was a full-time employee did not justify the placement of her desk in the reception area (*id.*).  Plaintiff also complained that she had to sort and distribute mail for all of the divisions, but Cathy Prouty and none of the other secretaries had to do it unless Plaintiff was out of the office (*id.*).  Ms. Chapman responded that Plaintiff was the only full-time person in the front of the office, and consumers needed to see someone when they visited the office (Doc. 1, attached Intake Questionnaire for Florida Commission on Human Relations, attached "Addition to Intake

Questionnaire Very Most recent incident").    Additionally, Plaintiff's Division, the Consumer

Services Division, is located in the front of the building shared by four Divisions (*id*.).  Plaintiff's

job description was revised to reflect her duties upon relocation to the new office space, however,

Plaintiff refused to sign it (Doc. 27, Cain Aff. Attach 4).

On January 20, 2004, Plaintiff filed a Charge of Discrimination with the Florida Commission

on Human Relations, the Equal Employment Opportunity Commission office for the State of Florida

(*see* Doc. 1, attached Charge of Discrimination).  The Commission dismissed the charge on April

29, 2004 (*see* Doc. 1, attached Dismissal and Notice of Rights).  Plaintiff initiated the instant action

on July 27, 2004 (Doc. 1).

II.    DISCUSSION

A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c); *see also* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548,

2552, 91 L. Ed. 2d 265 (1986).  "[T]he substantive law will identify which facts are material" and

which are irrelevant.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510,

91 L. Ed. 2d 202 (1986).  An issue of fact is material if it is a legal element of the claim under the

applicable substantive law which might affect the outcome of the case. *See id.*

At the summary judgment stage, a court's function is not to weigh the evidence to determine

the truth of the matter, but to determine whether a genuine issue of fact exists for trial.  *See id.* at

249, 106 S. Ct. at 2510–11.  A genuine issue exists only if sufficient evidence is presented favoring

the nonmoving party for a jury to return a verdict for that party.  *See id.* " If reasonable minds could

differ on the inferences arising from undisputed facts, then a court should deny summary judgment."

<u>Miranda v. B & B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing <u>Mercantile</u>

<u>Bank & Trust Co. v. Fidelity and Deposit Co.</u>, 750 F.2d 838, 841 (11th Cir. 1985)).

When assessing the sufficiency of the evidence in favor of the nonmoving party, the court

must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the

light most favorable to the non-moving party."  <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913,

918 (11th Cir. 1993).  The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative."  Anderson, 477 U.S. at 249–50, 106 S. Ct. at 2511.  "A mere 'scintilla' of evidence supporting the . . . [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment.  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting Anderson, 477 U.S. at 252, 106 S. Ct. at 2512).

B.      Hostile Work Environment

Plaintiff claims that the Department subjected her to a hostile work environment which included harassment, intimidation, humiliation, and aggravation (Doc. 1 at 2-3).

A plaintiff wishing to establish a hostile work environment claim must show that (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  In order to establish a basis for holding the Department liable for a hostile work environment, Plaintiff must show that the Department had notice of the alleged harassment and failed to take immediate and appropriate corrective action.  Watson v. Blue Circle, Inc., 324 F.3d 1252, 1257 (11th Cir. 2003) (citations omitted).

In the instant case, Plaintiff has failed to show that a genuine issue of material fact exists as to whether the alleged harassment was based on her race.  Plaintiff attached to her Title VII complaint a very detailed account, including narratives and copies of memoranda, e-mails, and correspondence, of every incident of alleged hostility, harassment, aggravation, intimidation, and humiliation she suffered during her tenure at the Pensacola office (see Plaintiff's Aff. and attachments).  None of this evidence even mentions race as a factor in any of the alleged hostility she suffered.  Indeed, the first mention of race appears in the Charge of Discrimination filed with the EEOC.

In support of the motion for summary judgment, the Department submitted an excerpt from Plaintiff's deposition in which she was asked to explain her claim of discrimination:

> Q:    You say here in your complaint that the events that happened to you are because of your race.  Can you explain that to me?

> A:    I was the only black person in the office.  And I feel like, being that I was the only black person in that office and everyone that I've complained to were Caucasian, they really didn't care.  You're just another person in the office.  Who cares?  So based on the fact that I was the only black person in the office, I feel that is why they did nothing for me.

(Doc. 21).

In response to the summary judgment motion, Plaintiff submitted an excerpt of a sworn statement of Karen Mason in which Ms. Mason stated that upon her arrival at the Pensacola office in approximately April of 2003, Diana Chapman told her about the incident where Cathy Prouty threatened Plaintiff:

> KM:    Um, she [Chapman] did say some, she, she tried to allude that it was some kind of a racial issue that we now have to, um, tippy toe around Eve because she's black, um, when, in fact, the issue, from the way she described the incident had nothing to do with color.

(Doc. 41, attachment).   Plaintiff's mere conjecture that race was the basis for her allegedly unfavorable treatment, and Ms. Mason's hearsay statement that Supervisor Chapman treated Plaintiff more favorably because she was African American, is insufficient to show a genuine issue of material fact as to whether the alleged hostile conduct suffered by Plaintiff was because of her race.  *See e.g.*, Hawkins v. Pepsico, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (holding that plaintiff's conjecture that race was basis for unfavorable treatment is insufficient to support finding of race discrimination).

Additionally, Plaintiff has failed to show that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.  The issue of whether harassing conduct was "sufficiently severe or pervasive to alter the terms of conditions of his employment"--under the fourth element of the prima facie case--involves both an objective and a subjective component.  Miller, 277 F.3d at 1276.  The objective severity of harassment should be judged from the perspective of a reasonable person in Plaintiff's position, considering all of the circumstances.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); Mendoza v. Borden, Inc., 195 F.3d 1238, 1246

(11th Cir. 1999).  In determining "objective severity," the court must consider, among other factors, "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  <u>Harris</u>, 510 U.S. at 23; <u>Mendoza</u>, 195 F.3d at 126.  "[C]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview."  <u>Harris</u>, 510 U.S. at 23.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has failed to show a genuine issue of material fact as to whether a reasonable person would find her work environment hostile or abusive, within the meaning of Title VII.  Although incidents occurred on a monthly basis during the first year and a half of her full-time employment, they occurred with much less frequency after that.  More importantly, even when incidents occurred monthly, all but one of them was of little severity and rose only to the level of petty and irritating.  The incident where Ms. Prouty threatened to "hit [Plaintiff] upside the head," although severe, was appropriately addressed with disciplinary action against Ms. Prouty and temporary physical separation of the parties' workspace.  Additionally, Plaintiff does not assert that any of the alleged hostile conduct interfered with her job performance.  Thus, Plaintiff has failed to show that a genuine issue of material facts exists as to whether the alleged conduct was sufficiently severe or pervasive to amount to a "discriminatory change in the 'terms and conditions of employment.'"  *See* <u>Harris</u>, 510 U.S. at 21.  Accordingly, the Department is entitled to summary judgment on the hostile environment claims.

C.     <u>Disparate Treatment</u>

The only allegation in Plaintiff's complaint that can be construed as alleging disparate treatment is her claim that the Department changed her job duties in December of 2003 to include tasks that other Caucasians in her position were not required to perform (Doc. 1, attached Charge of Discrimination, Attachment to Intake Questionnaire).  Additionally, in her amended response to Defendant's motion for summary judgment, Plaintiff suggests that the Department failed to respond to her complaints in a timely and proper fashion, but immediately responded to a complaint of Cathy Prouty, a Caucasian co-worker (Doc. 41 ¶ 2).

Under the well-established three pronged standard of proof, an employee has the initial burden of establishing a prima facie case of disparate treatment in the workplace.  Circumstantially, the plaintiff must show that "(1) she belongs to a protected class; (2) she was subjected to adverse job action, (3) her employer treated similarly situated employees outside her classification more favorably, and (4) she was qualified to do the job."  Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory explanation for the adverse action.  *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).  If the employer does so, the burden shifts back to the employee to show that the reason offered by the employer was not the real reason for the adverse employment action but merely pretext.  *See* Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998). The employee largely accomplishes this by demonstrating either that the discriminatory motive more likely caused the adverse action or that the employer's explanation for the adverse action is "unworthy of credence."  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981).

Initially, viewing the evidence in the light most favorable to Plaintiff, Plaintiff has failed to show she was subjected to an adverse employment action as a matter of law.  The relevant provision of Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a).  Courts have uniformly read this language to require a plaintiff suing under § 2000e-2(a) to establish, as part of her prima facie case, that she suffered so-called "adverse employment action." *See* Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001) (citing Merriweather v. Alabama Dept. of Pub. Safety, 17 F.Supp.2d 1260, 1274 (M.D. Ala. 1998) (a "term or condition of employment may be said to have been affected if there is a 'demonstrable adverse impact . . .'")), *aff'd*, 199 F.3d 443 (11th Cir. 1999); Allen v. Michigan Dep't of Corr., 165 F.3d 405, 410 (6th Cir. 1999) ("In order to set forth a claim of racial discrimination, a plaintiff must show that he has suffered an adverse employment action[.]"); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (finding that plaintiff failed to prove "the adverse conduct required to make a prima facie case").

Although the Eleventh Circuit has not adopted a bright-line test for what kind of effect on the plaintiff's "terms, conditions, or privileges" of employment the alleged discrimination must have for it to be actionable, the Circuit Court has held that to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show "a serious and material change in the terms, conditions, or privileges of employment."  Davis, 245 F.3d at 1238-39 (citations omitted).  Furthermore, "the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Id.* at 1239.

In the instant case, Plaintiff's claim is predicated on two kinds of employer acts that do not often meet the statutory threshold.  First, Plaintiff claims that the Department did not immediately and appropriately respond to her grievances, but immediately responded to a grievance filed by a Caucasian co-worker.  Second, Plaintiff alleges the Department changed her work duties to require her to perform tasks that other Caucasians in her position were not required to perform.

With regard to the Department's response to her complaints, construing the evidence in the light most favorable to Plaintiff, the evidence belies Plaintiff's claim; indeed, the evidence shows that the Department responded to each of Plaintiff's grievances in a timely and appropriate manner.  Furthermore, even if the Department did not respond in a timely and appropriate manner, Plaintiff does not allege she suffered any tangible harm as a result of the Department's allegedly delayed and insufficient responses to her grievances.  Plaintiff does not allege the Department's actions altered her compensation, terms, conditions, or privileges of employment, deprived her of employment opportunities, subjected her to formal discipline, or adversely affected her status as an employee.[4] *See* Davis, 245 F.3d at 1240-43.

Additionally, Plaintiff claims that she was required to perform receptionist duties for all four of the divisions in the new office space, but none of the Caucasian secretaries were required to

_____

[4]Although the evidence shows that Plaintiff received a documented counseling session on August 9, 2002 (Doc. 46, Plaintiff's Aff., Attach. M), Plaintiff has not alleged that this counseling had any adverse impact on her employment. Therefore, this court finds that the written counseling does not constitute adverse employment action. *See* Davis, 245 F.3d at 1241.  Likewise, to the extent Plaintiff claims that her negative performance evaluation in January of 2004 constituted an adverse employment action, she does not allege that the criticism had a tangible impact on the terms, conditions, or privileges of her employment. *Id.* at 1240-42.

perform these duties.  Although a change in work assignments may constitute adverse employment action if the change in job responsibilities is substantial (*see* <u>Davis</u>, 245 F.3d at 1243), the evidence, viewed in the light most favorable to Plaintiff, does not show that Plaintiff's job responsibilities were substantially changed.  Her revised job description reflects the following additions to her duties:

> Opens, sorts and distributes all incoming mail for the entire DFS [Department of Financial Services] office location; . . . receives deliveries.

> Maintains a working knowledge of DFS Service Point and Customer Relationship Management system.  Answers tier-one calls as necessary utilizing Service Point Knowledge Base and enters them into Service Point.  Assists Specialists and Administrator by entering new Service Requests and other related duties as needed in order to maintain office Service Requests are [sic] current.

> Greets, announces, and routes visitors for the Pensacola Regional Office, Division of Worker's Compensation and the Division of Agent and Agency Investigation in a courteous manner.  Answers office phone, routes calls, and takes and delivers accurate messages to staff.  Coordinates with Word Processing Systems Operator to insure that receptionist duties are covered, including coverage during lunch breaks, routine breaks, and any planned extended absences.

(Doc. 27, Cain Aff., Attach. 4).  This does not reflect a substantial change in the duties Plaintiff was previously performing.  Furthermore, Plaintiff does not allege that her job title or classification changed; indeed, the revised job description shows that her title remained Administrative Secretary (*id.*).

Even if the change in Plaintiff's job responsibilities was substantial, the Department has articulated a legitimate, nondiscriminatory explanation for the addition to Plaintiff's job duties.  In Supervisor Chapman's sworn statement to the investigator of Plaintiff's EEOC charge, Chapman explained the additional duties as follows:

> She [Plaintiff] does not like the fact that she has to do things for other people, other divisions.  And one of the things she had put in some of the paperwork is the other Administrative Secretaries.  Well Workers' Comp doesn't have any support staff at all, period.  Agent and Agency Investigation has an Administrative Secretary like Eve is but when they're working on investigations, their stuff is privileged and confidential.  And when we first designed the building, Sharon Kelson, their Secretary, was going to be out in an open area.  Well her division didn't want that. They wanted her in an office with a door with a lock on it so that if she's working on

cases, she can lock the office.  Well so that, that's been a stone [sic] of contention with Eve (Harris) all along.  But she feels she is treated differently but she isn't treated differently.  She's Consumer Services.  I need her up there to see consumers.

. . . I mean, that, that's part of her job.  Now, see, Kathy Prouty is our Word Processing Systems Operator . . . Kathy's position is only a four hour a day position. She (Prouty) has the position that I originally hired Eve (Harris) in for.  So when we moved in this building, Eve did not like the fact that I wanted her (Harris') desk in front of the window because she's there and consumers can see her eight hours a day. She (Harris) wanted to be over there where Kathy's (Prouty's) desk is so that consumers, when they walked in the front door, did not see her.  And I said, no, that leaves an empty desk over there four hours a day when people walk in the door.  I want your desk there so they can see a live person sitting there . . . It had nothing to do with what position you are, um, or anything.  It had to do with the fact that she's full-time and there would be somebody there to talk to consumers versus an empty desk there four hours a day.

(Doc. 20, Attach. 1 at 16).  Plaintiff has offered no evidence that the reason offered by the Department was pretextual.

In sum, whether considered individually or collectively, the employment actions of which Plaintiff complains cannot be considered "adverse" because they did not harm Plaintiff; and even if the change in Plaintiff's job duties constituted adverse employment action, Plaintiff has failed to produce evidence that the Department's proffered reason for the change was pretextual.  Construing the facts in the light most favorable to Plaintiff, she has failed to produce evidence of a prima facie case of disparate treatment; therefore, the Department is entitled to judgment as a matter of law.

D.    Retaliation

Plaintiff claims that the Department retaliated against her because she "blew the whistle" on Diana Chapman and Diana Kidder about their taking care of personal business on agency time (Doc. 27, Cain Aff. Attach. 5 at 2).  Plaintiff alleges the following as specific acts of retaliation:  (1) revision of her job description of Administrative Secretary in November of 2001 to include duties of a Word Processing Systems Operator and relieve her of most administrative duties; (2) Ms. Kidder and Ms. Arrington's refusal to permit Plaintiff to reschedule her lunch hour to 4:00 p.m. on May 10, 2002; (3) Cathy Prouty's filing a grievance against Plaintiff on July 19, 2002; (4) Ms.

Kidder and Ms. Chapman's giving Plaintiff a photocopying project on September 18, 2002; and (5) Ms. Chapman's placing Plaintiff's desk in the reception area of the new office space and requiring Plaintiff to perform reception duties for other Divisions, as well as receive and sort all incoming mail (Doc. 19, Plaintiff's Answer to Defendant's Interrogatory #6).  Additionally, Plaintiff claims that the Department made oral negative statements about her and placed false and negative statements in her personnel file (specifically, a memorandum resulting from a counseling session between Plaintiff and Supervisor Chapman, and Plaintiff's performance evaluation in January of 2004).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was some causal relation between the two events.  Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001).  Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action.  Id. at 1266.  If that burden is met, the plaintiff then bears the ultimate burden of proving, by a preponderance of the evidence, that the reason provided by the employer is a pretext for prohibited, retaliatory conduct.  Id.

Initially, none of the acts described by Plaintiff rises to the level of an adverse employment action (see section II.C. of this Report and Recommendation).  Additionally, to the extent Plaintiff argues the Participation Clause of Title VII's anti-retaliation provision applies, she has failed to state a prima facie case.  Under the Participation Clause, an employee is protected from discrimination if she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  See 42 U.S.C. § 2000e-3(a).  The Participation Clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."  E.E.O.C. v. Total System Services, Inc., 221 F.3d 1171, 1174 (11th Cir. 2000).  "[A]t a minimum, some employee must file a charge with the EEOC (or its designated representative) or otherwise instigate proceedings under the statute for the conduct to come under the [P]articipation [C]lause."  Id. at 1174 n. 2.  Activities invoking the jurisdiction of the federal government through the EEOC are entitled to expansive protection. See id. at 1175-76.

In the instant case, the copy of the EEOC charge attached to her complaint shows that the charge was filed on January 20, 2004, at the earliest.  All of the incidents of which Plaintiff complains occurred prior to that date, the latest occurring on December 8, 2003 (*see* attachments to Charge).  Thus, Plaintiff could not, as a matter of law, have engaged in protected activity under the Participation Clause at the time of the alleged retaliatory incidents, because she had not yet filed a charge with the EEOC.  *See* Total System Services, Inc., 221 F.3d at 1174.  Moreover, Plaintiff cannot satisfy the third prong of a prima facie retaliation case--showing a causal relation between the protected activity and adverse employment activity--for this same reason.

Furthermore, to the extent Plaintiff relies upon the Opposition Clause of Title VII's anti-retaliation provision, she has failed to establish a prima facie case.  Under the Opposition Clause, an employee is protected from discrimination if she "has opposed any practice made an unlawful employment practice by this subchapter."  *See* 42 U.S.C. § 2000e-3(a).  A plaintiff can establish a prima facie case of retaliation under the Opposition Clause if she shows that she had a "good faith, reasonable belief that the employer was engaged in unlawful employment practices."  Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).  In order to satisfy this standard:

> A plaintiff must not only show that [she] subjectively (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was objectively reasonable in light of the facts and record presented.  It thus is not enough for a plaintiff to allege that [her] belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.*  "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law."  Clover v. Total System Services, Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).  Opposition Clause acts are viewed in the context of the ordinary business environment, and, thus, are given less protection than Participation Clause acts.  E.E.O.C. v. Total System Services, Inc., 221 F.3d 1171, 1176 (11th Cir. 2000).

Initially, Plaintiff's coworkers' unauthorized absences do not constitute "a practice made an unlawful employment practice" by Title VII.  Thus, Plaintiff's complaints to supervisors concerning

the absences did not constitute protected activity.  Additionally, to the extent Plaintiff alleges she was subjected to discriminatory conduct as a result of those complaints, this belief was not objectively reasonable, as discussed in Section II.B. of this Report and Recommendation.

Furthermore, to the extent Plaintiff argues she reasonably believed that the Department was subjecting other employees to discriminatory conduct, the evidence does not support her contention. In opposition to the Department's motion for summary judgment, Plaintiff submitted the affidavit of James Jackson (Doc. 42), an African-American former employee of the Department who alleged that the Department harassed and retaliated against him for initiating an internal investigation into a Caucasian co-worker's referring to him as a "N_____," and reviewing his work behind his back. However, Jackson's affidavit describes events not known by Plaintiff, and is, thus, not relevant to a claim under the Opposition Clause.  *See* <u>Clover</u>, 176 F.3d at 1352 ("For [O]pposition [C]lause purposes, the relevant conduct does not include conduct that actually occurred . . . but was unknown to the person claiming protection under the clause").  When measuring Plaintiff's belief that she was harassed based on her race against existing substantial law, and viewing the same in the context of the ordinary business environment, *see* <u>Little</u>, 103 F.3d at 960, Plaintiff's belief that the Department was engaged in unlawful employment practices was objectively unreasonable.  <u>Clover</u>, 176 F.3d at 1351.  Therefore, Plaintiff cannot show that she was engaged in protected activity for purposes of establishing a prima facie claim of retaliation.

III.     CONCLUSION

Upon consideration of Plaintiff's claims and the evidence submitted, the court concludes that there exists no genuine issue of material fact, and that Plaintiff has failed to establish her claims under Title VII.  Thus, as a matter of law, the Department is entitled to judgment in its favor.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That Defendant's Motion for Summary Judgment (Doc. 24) be **GRANTED**.

2.     That judgment be entered by the clerk in favor of Defendant.

At Pensacola, Florida this 13<u>th</u> day of December 2005.


<u>/s/ *Elizabeth M. Timothy*                    </u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed findings and recommendations must be filed within ten (10) days after being served a copy thereof.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**